## CHAMBERLAIN & CO. *vs.* MASTERSON.

1. As to the distinction between guests and boarders at a hotel, and the liability of the landlord to each for the loss of goods.
2. If a boarder at a hotel fails to take such care of his watch as a person of ordinary prudence should take, the landlord will not be responsible for its loss.
3. On the request of the jury for further instructions, the presiding judge said, "I perceive from your questions that your minds have been misled by a case read by defendant's counsel", and then stated to them, "that they should receive the law only from the court,—that counsel often read books to the jury to explain themselves more clearly and forcibly, but that they must not receive them as law, except so far as sanctioned by the court": *Held*, that there was no error in these instructions.
4. The refusal of the court to allow counsel, after the argument has been closed and the cause submitted to the jury, to explain a distinction applicable to the case, is not revisable on error : such matters properly belong to the conduct of the cause, and are entrusted to the discretion of the presiding judge.
5. It is error to instruct the jury, "that the main charge was to be with them the controlling part of the charge."

APPEAL from the City Court of Mobile.
Tried before the Hon. ALEX. McKINSTRY.

THIS action was brought by Hugh Masterson against Chamberlain & Co., to recover "one hundred dollars damages for the value of a gold watch, chain and key, stolen from the room occupied by plaintiff, as the guest or boarder of defendants, at the 'Battle House', then a public inn of Mobile ; the said defendants then and there being the lessees and proprietors of said house ; and the said watch having been stolen by one of the servants of said proprietors of said house between the tenth and twenty-fifth of the month of ——, 1853."

Other counts were added to the complaint, "by order of the court", in one of which it is averred, that the watch was lost by plaintiff from a room which he occupied at the Battle House, then and there a public inn, of which defendants were at the time lessees and proprietors, and the plaintiff their guest ; in the second, that the watch was lost by plaintiff, without any fault or negligence on his part, from a room which he occupied as a guest at the Battle House, a public inn of which defendants were the owners ; and in the third, that the watch was stolen from the room occupied by plaintiff in the Battle House, a public inn of which defendants were lessees and proprietors, and that it was stolen by one of the servants of said house then in the employment of said lessees and proprietors.

To the first count in the amended complaint the defendants pleaded, "that the Battle House was not a public inn, and that no watch was lost as charged"; and to the second and third counts they took issue, in short by consent.

On the trial, as appears from the bill of exceptions, "there was evidence tending to show that plaintiff was a guest at the Battle House, an inn or hotel kept by defendants, as also to show that he was a boarder ; that his watch which he wore was taken from his room in the Battle House ; that the room was attended to solely by the servants of the hotel, one of whom daily visited the room for the purpose of cleaning it; and that this servant kept a key to unlock this as well as many other rooms on the same floor."

" The court charged in full and at length on the liability of

innkeepers and hotel-keepers to guests and boarders, and the duties of guests and boarders ; and among other charges, that if they believed that the watch was taken from plaintiff's room in the hotel, and was taken or stolen by the defendants, or by the servants employed by them in the house, or lost through the negligence of said servants, without any negligence on the part of plaintiff, then the defendants were liable to plaintiff, if he was either a guest or a boarder."

The defendants excepted to this charge, and requested in writing the following : " That if the jury believe that the defendants used ordinary care in regard to the property of the plaintiff, and they find the plaintiff to have been a boarder, the defendants are not liable ; also, that if the jury believe Masterson was a guest at the Battle House, and that he was negligent, he cannot recover"; which charges the court gave.

" On the next morning, the jury came in, and requested some explanations in reference to the two last charges given by the court at the request of the defendants ; in reply to which the court declined to say anything more than had already been said, except that the main charge was to be with them the controlling part of the charge ; to which defendants excepted.

"After a time, the jury came in again, to ask further questions ; in reply to which the judge asked them, if they referred to a case which defendants' counsel had read in his argument from one of the English Reports. Their foreman said, 'Yes'; and the judge then said, 'I perceive from the questions that your minds have been misled by the case that was read', and then stated to them, that they should receive the law only from the court ; that the counsel often read books to the jury to explain themselves more plainly and forcibly, but that they must not receive them as law, only so far as they were sanctioned by the court ; to which defendants excepted.

" The jury then retired, and shortly afterwards sent a slip of paper by the sheriff to the judge, on which was written, 'Question by one of the jurors : If the jury think that Masterson was a boarder, are the defendants liable as though he was guest ?' which the court read aloud, and, the defendants' counsel being in court, called his attention to it, and then sent for the jury, and repeated to them what had been said to them

in the main charge of the court; and in answer to a question by one of the jury, as to what was the test of Masterson's negligence, the court asked them, if they had come to any conclusion as to the fact whether Masterson was a guest or a boarder. The foreman answered, that they found that Masterson was a boarder, and that the defendants were innkeepers. The court then charged the jury, that if Masterson took such care as a reasonable and prudent man would take of his property, he would not be guilty of negligence, and that if he did not take such care he would be negligent; and that if he did take such care of his watch as a reasonable and prudent man would take of his property, and the property was taken or stolen by the servants of the defendants employed in the house, or lost through their negligence, the plaintiff was entitled to recover; to which charge the defendants excepted.

"The defendants' counsel then began to explain to the court the difference between a guest and a boarder, but the court declined to hear him, on the ground that the other counsel was not present; to which he excepted."

The appellants now assign for error—

"1. The charge of the court making an innkeeper responsible for the loss of goods of his guest stolen by his servants.

"2. The charge making an innkeeper responsible for loss of goods of a boarder stolen by a servant.

"3. Error in the charges generally.

"4. Error generally in its *colloquiums* with the jury, and its refusals to charge as requested."

CHAS. P. ROBINSON, for the appellants:

The rule of law in the English courts, as well as of most of the courts of the United States, is, that "an innkeeper is responsible for losses happening to goods of travellers becoming his guests, except such as happen from the act of God, public enemies, or by the conduct of the guest himself, his servant, or the companion he brings with him."—Mason v. Thompson, 9 Pick. 280; Calye's case, 8 Co. 32; Smith's Lead. Cas., vol. 1, p. 266. But in deciding upon a case for the first time in this court, it seems proper to consider the origin, causes, and propriety of this rule, and whether they are such as require our courts to recognize the same rigorous rule in all its extent,

or whether, at least, it should be narrowed to its strictest limits.

In the earlier and ruder times of England, we readily find the cause and origin of the rule, and discover its justness. There was then but little general communication between the people of different sections and districts; the means and the habit of frequent intercourse, and the rapid circulation of trade and ideas, had not removed the wide differences that · existed in the sympathy, knowledge, and feelings of distinct neighborhoods; the town was at a great remove from the country, and an inhabitant of one village felt as a stranger when business or pleasure called him into another; even an expedition to a neighboring fair or market was clothed with something of the terrors of a pilgrimage to unknown countries, and a sense of insecurity accompanied every act of traveling. Traveling, too, had not only its imaginary, but its real terrors: the roads were infested with robbers, thieves, and outlaws; it was in the power of any one, unlicensed, to become an inn-keeper; and the comparative rudeness and lawlessness of the times invited unworthy persons to this calling, to abuse the confidence which travelers were compelled to repose in them. The police power of those times had nothing of the sufficiency for the detection of crimes that now belongs to it. It was ⸱ this weakness that made the hundred responsible wherein a man was robbed, unless upon hue and cry the thief was taken; and in this same weakness of the police power,—in the imaginary as well as real dangers then attached to traveling, in the general want of respectability in the calling of innkeepers, and in the temptation to collude with thieves and robbers to plunder unprotected travelers, we find the true and sufficient origin of this rigorous rule of the liability of innkeepers for "the loss of the goods of travelers becoming their guests."

But hardly one of these grounds remains now, in this age and country, to uphold the rule. A common language, common ideas, common laws, the habit of traveling, equal knowledge, and an active intelligence, have disarmed traveling of most of its terrors, both real and imaginary, and clothed the traveler with a citizenship wherever his journey leads him. The landlord of the present day, instead of being low in the scale of respectability, and in a position to invite unworthy

suspicions, is always—whether he swings his sign by the road-side, or holds his justice's court in a village tavern, or presides amid the elegancies and splendors of a fashionable hotel—the frank, honest, intelligent, and hospitable gentleman, whose interests all lie upon the side of watchful honesty in regard to the person and goods of his guests. No apology for the rigor of the rule can now be found, as in early times, in the weakness of the police power : the laws, and an active, organ-ized police, are far more adequate now than then for the de-tection and punishment of crimes. To this power belongs the duty : if it is inadequate, let it be improved and strength-ened. It is as unworthy and unjust to hold the respectable innkeeper responsible for the crimes of others, to which his exposed situation may make him a victim, as to re-enact upon the innocent inhabitants of a hundred the ancient penalty for the robberies and felonies committed within its limits. It is a relic of half-civilized times and imperfect government, which finds no support in the present well-ordered condition of society and the efficiency of government. If, then, the reasons of the rule so entirely fail, why should not the rule cease with them ?

It is begging the question to say, that " there is a confidence reposed in the innkeeper that he will provide honest servants, and that his negligence in this respect is a kind of implied consent to the robbery."—1 Black. Com. 430. What is the business of an innkeeper, but an ordinary business—a necessary calling in the economy of society, distinguished by no peculiar privileges or emoluments? Why should it be loaded with so onerous a burden? In it, care and attention are bestowed upon the persons and goods of guests, in consideration of a price paid, and honesty and fidelity are required, as in cases of other ordinary paid bailees for service or hire, whom yet it was never thought to charge, except upon proof of negli-gence. What greater facilities have they, or what greater inducements, to abuse the trust reposed in them, than the warehouse-man to whose sole custody untold thousands are committed, and who, while bound to diligence and fidelity, is exonerated from liability for the embezzlement of his store-keepers or servants?—1 Stew. 284; 13 Ala. 587; 4 Gill 406; 9 Wend. 268. And where, in the present condition of society

and the nature of the business, do we find any ground for charging them for the criminal conduct of their servants?—Story on Agency, § 456.

But, however the law may be held as to the résponsibility of innkeepers for the loss of goods "of *travelers* becoming their *guests*", the rule was early held inapplicable to *boarders*, and a distinction was early recognized between a guest and a boarder. A guest was a traveler or wayfarer; but a person who came upon a special contract to board or sojourn at an inn, was not in law a guest, but a boarder.—Bacon's Abr., tit. "Inns", c. 5; Story on Bailments, § 477; Comyn's Digest, tit. "Action on the case for negligence", (B) 12. The same liability is not incurred in regard to the goods of boarders as to the goods of wayfarers: to give a boarder a remedy against an innkeeper, the latter must have been guilty of culpable negligence.—Authorities *supra*; Manning v. Wells, 9 Humph. 746; Parsons on Cont., p. 628. The rigor of the general rule, and its inapplicability to the times, should incline the courts to the recognition of this distinction.

The court erred in telling the jury that they were misled by a case read by defendants' counsel. The court is to decide the law, and not the case. It required a participation in the deliberations of the jury, to determine what was operating upon their minds, and enable the court thus to address them; and to tell them they were misled, without showing them wherein, was calculated to confuse them.

WM. BOYLES, *contra:*

The evidence tends to prove that the watch was stolen by one of the servants of the hotel, or lost by his negligence; no other person having access to the room than the servant who was provided with a skeleton key, which was kept for the purpose of opening the door during Masterson's absence. The landlord is responsible for the dishonest or negligent acts of his servants. Masters, also, are answerable for injuries occasioned by the wrongs and negligence of their servants; if committed in the exercise of the functions in which the servants are employed by their masters, even when the latter have no power to prevent them, and they are committed in their absence. This rule was established to make masters

careful in the choice of those whom they employ. Innkeepers are held responsible to as strict an extent as common bailees, and the principle was taken from the Roman law.—Story on Bailm., §§ 470, 471; Story on Agency, p. 637; 2 Kent's Com. 592; Walker v. Bolling, 22 Ala. 294.

The case of Manning v. Wells, 9 Humph. 746, which is cited by appellant's counsel, has no application to this case, as will be seen by reference to the facts.

GOLDTHWAITE, J.—The law held the innkeeper responsible to travelers who became his guests, for all losses *infra hospitium*, in every case, unless he proved that it was not owing to any default in him or his servants (Calye's case, 8 Co. 32); and some of the cases go further, and hold him liable for the acts of other guests.—Jones on Bailm. 94; Story on Bailm., § 470; Shaw v. Berry, 31 Maine 478. But there is a distinction between the liability of innkeepers towards guests and boarders, which was taken at an early day.—Calye's case, *supra;* Bacon's Abr., "Inns and Innkeepers", c. 5 ; Story on Bailm. (4th ed.) § 477 (3). If the goods lost belong to a boarder, in order to charge the innkeeper, he would be required to show that the loss was owing to the failure on his part to discharge the duties which his situation as boarding-house-keeper, or the special contract with the other party, imposed on him ; and these duties must be measured by the analogies of the law applicable to other species of bailments. The hotel-keeper employs the servants to attend to the rooms, and his boarders have a right to expect that he will employ those who are honest ; and if he fails to do so, and a loss is thereby occasioned, without negligence on the other side, he is held responsible, precisely on the same principle that a steamboat owner is, if an injury is sustained by the failure to employ a skilful pilot, or a careful engineer, or a competent captain.—Walker v. Bolling, 22 Ala. All bailees are liable to third persons for the acts of their agents or servants, done in the course of their employment. We do not mean to say, that it is not incumbent on the boarder to use that degree of care which ordinary prudence requires. The guest who, after exposing bank notes which he had in a box in the presence of many persons, left it in the commercial room, was held guilty

of gross negligence (Armstead v. White, 6 Eng. Law and Eq. 349) ; and if a boarder leaves money, or valuables, open and exposed in his room during his absence, it would be doubtful whether this would not be such negligence on his part as would prevent a recovery if they were stolen by a servant of the house. ' Neither guests nor boarders should tempt persons who occupy the situation of servants about hotels, in this way; and if the property was stolen under such circumstances, even by a servant of the house, we are strongly inclined to the opinion, that the keeper would not be liable.   Here, however, no question of this kind arises, as the record fails to show any negligence on the part of the boarder ; and although it is to be inferred from the charge given by the judge, as to what constituted negligence, that the question was raised, there was no error in the charge upon that point, which was, in effect, that if the boarder did not take such care of his watch as a person of ordinary prudence should, the landlord would not be liable.

Neither was there any error in what was said by the court to the jury, in relation to their being misled by the case read by the counsel for the defendants on the trial below.  *Non constat* that it laid down the law correctly ; but whether it did or not, we see no impropriety in the judge instructing the jury that they were not to receive it as law further than was warranted by the charge of the court.  If the case read was regarded by the counsel as a correct exposition of the law, and applicable to the case on trial, he might properly have requested a charge which asserted the same legal proposition; but failing to do this, we cannot say there was any error in the action of the court in this respect.

So, also, as to the refusal of the judge, after the argument was closed and the cause submitted to the jury, to allow the counsel to explain the distinction between a boarder and a guest.  These are matters properly belonging to the conduct of the cause, which are entrusted very properly to the discretion of the judge trying the cause, and are not revisable here.

But in instructing the jury that the main charge was to be with them the controlling charge, we think the court erred. When a charge is requested, which has not been given, is not abstract, and asserts a correct legal proposition, the party has

the right to demand that it should be given, without any qualification. We do not mean to say, that after giving it, the court may not prevent its undue effect by presenting the law applicable to the evidence on the other side, or any portion of it. It is frequently necessary, to prevent injustice, and to enable the jury to comprehend clearly the law applicable to the case, that a legal principle which governs it in one aspect should be presented to the jury in juxta-position with the law upon the facts in a different aspect; and every one who has practiced before juries will understand that this course is frequently necessary to prevent one side from obtaining an undue advantage over the other. But it might entirely destroy the effect of the charge given, if, after giving it, the jury were told that they must be governed by the main charge ; and such were, in effect, the instructions given by the court. We can imagine no case in which such a charge would not have a tendency to mislead the jury.

For this error, the judgment is reversed, and the cause remanded.